Good morning. We're ready. Thank you. Good morning, your honors. I would like to reserve five minutes. I'm Sherry McCracken and I represent Vernon Harris, a former commissioner of the Maricopa County Superior Court and a black male. This is a matter where the actions of the defendants lack such fundamental fairness, common sense, and rational explanation that they shock the conscience. There was no attempt to follow any fair policy. The actions and treatment of Harris were distinctly and manifestly unequal to the treatment of white commissioners and employees. Defendants did not follow their own sexual harassment policy. ER 277-282. I'm going to refer to lots of ERs because this is a motion for summary judgment and we're looking for genuine disputed facts. They did not follow good investigative practice, 577-594, nor did they follow the code of judicial conduct of the Arizona Supreme Court, Rule 81, their own practices, policies, or decisions. The decision here adopted wholesale, practically without question, the defendant's statement of facts, seemingly ignoring the plaintiff's facts and controverting statement of facts. On cross motions for summary judgment, the district court granted all of defendants and denied all of Harris's. The decision failed to acknowledge evidence of disputed facts in the record. Particularly as to discrimination, minimal evidence defeats summary judgment. Summary judgment is rarely appropriate as discrimination is an elusive factual question which can only be resolved by strict scrutiny, most appropriately done by a jury, as this Court said in both Mottoyer, Yartsov, and most recently in Noyes. The business reason must be clearly set forth by admissible evidence. The burden to rise a tribal issue of fact on pretext should not be an onerous one. Once it is raised that the decision was not consistent with stated reasons, it should go to a jury, as this panel has said before. Let me ask you in terms of the causes of action, has Mr. Harris either intentionally or unintentionally abandoned his claims of negligent infliction of emotional distress, equal protection claim, and racial discrimination under a disparate impact theory? No. So all of those are still in play? Yes. The district court committed error by not using the correct standards and substituting its own opinion for the facts. This is a summary judgment matter. The Court must review the evidence in the light most favorable to Mr. Harris to determine whether genuine issues of fact exist. Here, if there are genuine issues of material fact, this Court must reverse. In the discrimination arena, if there is a genuine dispute as to the business reason, it must reverse. If there's a genuine dispute that the business reason was a pretext. Well, let me ask you on your sex-based hostile work environment. Yes. Why doesn't the claim fail as untimely because he did not file with the EEOC within 300 days on that? He did file with the EEOC within 300 days. Title VII, just like any other thing, when you are harmed is when you know that the cause arises. And the facts that we have going forward are the arising of the sexually hostile work environment which cumulated in him being terminated. So what are you saying you get to count from the 300 days from? From the February 12th date, which is the day that he was terminated, the day that he knew he was harmed. Do you have anything to support that? That people can wait until they're terminated before they file any EEOC claim? From hostile work environment? Is that what we're talking about? Yes. The first one, there are two discrimination claims, actually several. One is sexually hostile work environment while he was working there and it was ongoing. And the third is desperate treatment, excuse me, I always mispronounce the word. Desperate as opposed to desperate. Yes. Discrimination based on his treatment both as a male and as a black male. And the court, when you go back and look at it, treated women who misbehaved in a sexual manner much differently than they treated mere allegations that Mr. Harris may have made some inappropriate comments in a third-party manner. But the sex-based hostile work environment, that determination isn't one of the acts that we're claiming that form the basis for that. Yes. So I have problems with you starting your 300 days from that date on that particular charge. Well, even if we only take the sex-based sexually hostile work environment back to his last day of work, we see it because it's different that he wraps Christmas gifts with a woman alone in court. The ongoing sex --. It has to go, you count it from the dates that the acts that they're claiming are, that, you know, bring about the work, you know, the hostile sex-based, because he has sex-based hostile work environment, and then he's got race-based hostile work environment. And those, I think, are different. Yes, and the same. I mean, many of the same facts will support him. In this particular case, the evidence of discrimination is clear when you look at the response to what is maybe the Harris investigative file, Exhibit 60, 307-479. Also look at the response to the act. Well, did he have a property interest in his employment? Yes, he did. What was that? Okay. Because he was an at-will employee. Actually, I don't think it's an at-will employment, Your Honor, and that's the Arizona Employment Protection Act has two areas which I think give Mr. Harris both a entitlement to his job and a right of wrongful termination in violation of public policy. 23-1502-2 says that there can be wrongful termination in violation of a statute. However, the Employment Protection Act says that nothing changes as to public employees' rights under the law. Then 23-1502-3D says that a public employee will have a right if he has any entitlement to continued employment under statutes, rules, procedures, law and contract. Because the law of the State of Arizona recognized implied contracts under Wagon-Seller-Leak-Vold, Mr. Harris has a right to continued employment until the rules, Rule 81 of the Arizona Code of Judicial Conduct. Well, but you can't fire, if you're an at-will employee, you can't fire someone, say, because they're black or they're a woman or this, that or the other. I mean, clearly, as far as that goes. But still, if you're an at-will employee, that doesn't automatically transform you into having all the same rights, you know, absent those issues. If you don't prove those issues, I think what Judge Haga said, you know, that what evidence is there that the at-will employment was transformed to anything else but at-will? All right. But that's, first of all, what I'm saying is the district court says that my client was at-will because there wasn't a written contract signed by the party to be charged. I want you to know that merit employees don't have contracts signed by the party to be charged. Each of you has lifetime tenure, and I doubt that you have a contract signed by anyone. We have a commission right up on our wall. So we do. Yes, but he had a commission, too, from the state of Arizona that he'd been appointed. Then what you do, because he's a public employee and he has all the rights to laws before the Arizona Employment Protection Act, Arizona law to that time recognized implied contracts and the enforcement of implied contracts as exceptions to the at-will doctrine. And in this particular case, Rule 81, which on its face says that it's the law of the state of Arizona under the definition of law, the sexual harassment policy which applied to everyone at the court, form terms of his policy and give him a contract that until such fundamental fairness and procedures are given to him that he cannot be terminated. A failure to follow established policies shifts the burden to the employer to justify failure. Do you have a liberty interest to be protected here? Yes. What was that? You have a liberty interest when the reason given for your termination is something that would be, I don't remember the term exactly, scandalous. In this particular case, we are now told, and we were only told it after litigation started, that Mr. Harris was not terminated for sexual harassment. He was terminated for something called improper behavior with female staff. Not knowing what that is, I still think that it has a stigmatizing effect. Also the ---- Was that made public? That's a requirement. Okay. No, it needs to be published. It doesn't have to be made public in the broader sense. And in this particular case, there's testimony that ---- Well, what's the difference in publishing and ---- Published to a group of people or to colleagues. In this case, you can publish to court officials or to the legal community as a whole. Well, that's made public. Isn't that made public? Well, it's just that I've had arguments ---- It's not ---- It doesn't have to be in writing. No. No. Okay. And in this case, Michelle Miller, the alleged complainant, thought he was terminated for sexual harassment. So did Kelly, the former deputy administrator, the black administrator who was never contacted about her dealings with Mr. Harris. Well, I'm going to help you a little bit on this. Sure. That I think that ---- I'm not sure it solves the problem, but I think that this absent expungement, placement of stigmatizing material in a personnel file in the face of a statute mandating release upon request constitutes publication sufficient to trigger a due process liberty interest. And that's, I think, Reynolds, Vanelli v. Reynolds. Right. And we have cited that, Your Honor. And I think our brief says that we go much more into that. Also, in this particular case, we've never been given business reasons for many of the actions of the court. Why did the presiding judge demand an order that he receive nothing in writing? Judge Callahan, as you mentioned, there's a reason that the people who see the witnesses get to make the credibility determinations. And the sexual harassment policy which applied to him gave the presiding judge a non-delegable duty to do the investigation. And instead, what we have is almost a chain of gossip. And talking about genuine disputed facts, Michelle Miller, the, quote, alleged complainant, her deposition and her affidavit are almost in opposite of what we were told that the court said she said. That in itself should be enough to overturn. The order itself also is inaccurate. And it's one of the reasons that I've been going to ERs. For example, the district court decided that one of the business reasons that Mr. Harris was let go was because of poor job performance. Well, it's disputed. Kelly, who worked with him for 11 months and actually saw him on the bench, said he was one of the best commissioners. On its face, the statistical evidence, which is supplied by Jobs, about poor performance on orders of protection, ER 221 to 226, is contradictory. And the other testimony says that he was wonderful about these kinds of things. Also, different reasons. Campbell said that the alleged poor performance, the letters, those kinds of things, are not true. And furthermore, they told the EEOC that Mr. Harris was terminated for innuendo, double entendres, and other stigmatizing words. And the EEOC, that's not publication, is it? I think that it may not be public or publication. I do believe that it's absolute evidence of intent. Well, but I guess what I'm concerned about is, was there anything, any indication or any evidence that this sexual harassment was the basis for the termination that was communicated that would reach the public? Yes. What? Okay. We have Jobs, the JA, who was still talking about it to people when her deposition was taken two years later. We have Miller, who was a member of the public by this time, who was told that it was sexual harassment. Kelly was told that it was sexual harassment. And she had no input with the investigation whatsoever. The entire legal community in the State of Arizona thought it was sexual harassment. Now, if it is, as you say, he would be entitled to a hearing to dispel that, right? Right. He would be entitled to a name-clearing hearing for a liberty interest, yes. Did he ever request that? No, he didn't. But I did not find anything. Isn't that required? No. I did not find anything that said that it was required in this circuit for a liberty interest. Well, other circuits require it, but there isn't a Ninth Circuit-published case. Well, and, you know, back to who we're dealing with here, we're dealing with the courts. The courts should know enough to give people fundamental fairness, which this one said that it owed Mr. Harris. Do you want to reserve the balance for rebuttal? Yes, please. Okay. Thank you. Good morning. May it please the court, counsel, my name is Catherine Baker. I'm with the law firm of Green and Baker in Scottsdale, Arizona. I'm here representing the state of Arizona, the Maricopa County Superior Court. This is a case where the facts have been thrown about quite a bit, I think, by Mr. Harris's counsel, without true adherence to the record. I think there are certain facts that are undisputed, and the district court was quite careful to note where the facts were undisputed and to rely only on those undisputed facts. Harris does not dispute that information about his judicial misconduct came forward to administration at the Superior Court in two ways, on two fronts, and this is important because it builds the credibility of the facts that were ultimately found. We know that Miller talked to others about what happened in chambers that day, and there are certain things that are admitted by Harris about what happened in chambers, and any one of those things, according to Judge Campbell, would have been good enough for him to say, hey, not in my court, not by my judicial officer, and what Harris did admit is talking to Miller about her tattoos, and what Miller testified to quite explicitly was talking about her different tattoos, bending over to lower her pants and raise her shirt to show the tattoo on her lower back, which many people would consider a rather intimate part of the body, although not the most intimate part they discussed that day. We see it all the time. Do you? Well, walking around, it seems to be. Sure. It seems to go to any mall. And how surprising it would be if any of us brought a subordinate or was in the company of a subordinate in our office in any setting and said to them in the workplace during work hours, have any tattoos? And remember, this is a judicial officer. Do you have any other tattoos? What do they look like? Can I see that one? You have a pierced tongue. What's it like to kiss someone with a pierced tongue? I was at a party one time where I sat next to someone with a pierced tongue, and I wondered what it would be like. So you're saying he was discharged for sexual harassment? Judicial misconduct. It's judicial misconduct. And I think the court is illustrating one of the problems with the plaintiff's argument, and that is, and I have the letter placing him on leave. Well, what was the judicial misconduct? It was because he was harassing the girls. No, it's conduct unbecoming a judicial officer. And quite clearly at the beginning, because Westover ---- It's unbecoming. Because why? Because it's inappropriate. It's not decorous. It is not appropriate befitting a judicial officer, even though it's not sexual harassment. And we had Karen Westover, as you recall, who's an investigator and also an attorney. And she recognized, as most attorneys do when they see allegations like this, it would have to be quite a bit of information. It would have to be create a hostile work environment or be a request for sex to be sexual harassment. That's not what they were looking at. They were looking at things like, was she alone with him in chambers? At what time of day, what were they discussing? Wrapping Christmas presents. Wrapping Christmas presents. And some people might say, well, hey, why is she doing that? But that wasn't the issue. There were also issues, as you know, about having Betsy Jobes or allowing Betsy Jobes to leave court property during court hours to go pick up his car at the mechanics, which, again, is another thing he admitted occurred. So he admitted the judicial misconduct of the inappropriate interchange with a subordinate employee regarding personal matters. Isn't that done all the time, where errands are done for bosses? Not in our court, no. It is not done all the time that someone is sent off property to pick up a car. And remember, Marcus Renkensmeyer's concern was you're smiling. I don't know. It's not done in our court. Marcus Renkensmeyer, the chief court administrator, said. He drove me to the airport. Would that be bad? I don't know how Judge Campbell would have viewed that. Were there no dispute about the facts, however, he may have reasonably said that that was judicial misconduct. And the issue here isn't do you agree with his decision or was it the right decision. I'll tell you what bothers me. Okay. It seems to me that we have a liberty interest here. Whether you say it's judicial misconduct or not, it's really the relationship that he has with the woman in the office, whether you say that's harassment or not or judicial misconduct. But if that is transformed and published to other people, it seems to me that he should have an opportunity to have a hearing to dispel that. And he didn't. There's a couple of issues there. Also, too, I think the judge resolved this saying he didn't ask for a name-clearing hearing and, therefore, that defeated his claim. And in the Ninth Circuit, there isn't a case. It's not like there are two other circuits, I think, that have cases that say you have to request a name-clearing hearing or you're out of court. But we don't have that in the Ninth Circuit. Right, although the district court didn't find a liberty interest and, in fact, there wasn't one. I mean, we've waited and waited and waited and waited for the plaintiff to come forward with some proof admissible that the court ever made a statement to anybody. Is the plaintiff back there? Is that why you're pointing back? I'm sorry. Plaintiff's counsel, I tend to gesture, excuse me, as I do in court. But they haven't come forward with any admissible evidence of a statement made by the defendants, by the court, to anybody about anything that isn't privileged. And they tried. They tried mightily, and the court analyzed each other. How did the other cities know about it? I have no idea. I have no idea. And it's not my job to prove it. It's Harris's job. Well, they did prove that those other cities didn't have that information. Absolutely not. The district court found that they didn't have any evidence about the city of Phoenix municipal court that was admissible. They tried to offer evidence about Avondale. I believe it was, and it was all secondhand hearsay. And then they claimed something about the city of Glendale. However, the city of Glendale had knowledge that he presided over a matter he shouldn't have, and they're entitled to take whatever action they want because of that. Where's the statement by any of our people? Where is the proof that we said anything? And we've cited to you the Ballos case. Mere inferences drawn from a dismissal will not establish a violation of a liberty interest. What if he wants, I guess on the due process, what if he wants to work somewhere else, and part of that requires, for example, with the Federal Government, like certain things like when I did this job, I had to sign releases for all of my prior employers so that they could go back and look in my personnel files. Well, if he wants to get a job like that, and since he's, what, there's negative information in there, and he's never been given any opportunity to put anything in that file to rebut it, what, you know, doesn't he have some right to, you know, I mean, that's going to, they're going to be able to go look at that. And I think the Vanelli case that I talked about, if there's a statute that requires that say that you have to sign a release so that they can go look at it, doesn't he have a tribal issue there? No. There's a couple of reasons for that. Number one, and this is one of their whole complaints, there's not much documentation of this, and the documentation there was was not placed in his personnel file. Where have they come forward and shown you a document contained in his personnel file that constitutes a stigmatizing public disclosure? They haven't done that. Where's the record citation for that? In fact, one of the biggest arguments they've made. Can he answer a question honestly that he, if they ask you a question on an employment form, have you ever resigned in the face of, like, threats of being terminated? Can he say no, that he just resigned? No. And Arizona doesn't recognize self-publication as a defamation claim. Where is the case law that that type of an answer would be liberty interest such that he would get a right to get a hearing? And where does that stop? Then does every employee that's ever terminated from an at-will relationship by a public employer all of a sudden get hearing rights? Doesn't his personnel file just say he was terminated? His personnel file has no right. Or does it say he resigned? What does it say? It has his resignation letter in it. And then, again, I don't think they put this in the record. It would have a personnel action form that would just say separation from employment and have the dates. It's called a PAF form. And here's what's --. There's nothing in his personnel file about the harassing other employees or anything along those lines? We never called it harassment. The only possible thing that would be in his personnel file, but I don't believe that the record shows that it is, would be the letter placing him on administrative leave, which says that it relates to his conduct with women. It says investigation regarding your conduct with court staff. And that's not specific as to what that is. That could be sending Betsy Jobes to pick up his car. How is that a stigmatizing public disclosure? He could be asked questions about that, but he has to truthfully answer questions to a prospective employer anyway. And so there isn't any evidence sufficient for this court to find or for the district court to have found that there was a liberty interest that required a hearing. Their whole argument in that regard is terribly inconsistent because of their claims about a lack of documentation and saying there should be more, but there wasn't, but now we think there's too much. If I can go to Ms. McCracken's argument about the EPA, I think that she misstated somewhat what her argument really is and what was analyzed by the district court. What she has tried to say is that under the third exception to ARS 23-1501, the Employment Protection Act, that she can somehow show that there is a transformation of the at-will employment relationship to something other than that. And that exception requires a writing, a manual, a handbook or writing that expresses intent that it be an employment contract and limits termination rights or specifies a term for employment. So the court did not say, as was suggested here, that there had to be a writing signed by him, but there has to clearly be an intent manifested by the parties that the relationship be changed. And there was none here. Counsel suggested on another note this morning in her argument that there was some claim for wrongful termination. And we've let the court know, and I think it's in the district court order, that there was a motion for judgment on the pleadings granted on the wrongful termination claim. So there is no such claim in this case anymore, and it was not preserved through appeal. With regard to your questions about Title VII early in the argument, you're absolutely right that the claim was untimely, and this is the sex-based claim under Title VII. The last conduct at issue was December of 2000, and this is when Mr. Harris said, oh, by the way, even though I'm already on leave and therefore I believe I will be terminated, I think I had a complaint about inappropriate conduct in the workplace that happened between May and December of 2000. It is that last act of his complaint of conduct which would give rise to his claim, and he filed 313 days late with regard to that. The biggest argument that the plaintiff has made here... When you say 313 days late, are you saying... I'm sorry. 313 days was when he filed. So he filed 13 days late. Therefore it was late. Yes. One of the biggest arguments he's made is this comparison of files and his arguments about how other employees were treated, and we have called the other employees C1 through C4. Those are the commissioners, and there were certain commissioners that the district court allowed comparison with. Counsel would like to go through and count the number of pages in each file, and I would suggest to you that there is no case law that says that that's the magic number and how we decide whether one employee was treated more favorably or less favorably than another. In fact, I think their argument is inconsistent in this regard, because imagine, had we built the evidence that we had of judicial misconduct and then said, but wait, let's go make sure that the other commissioners that we've looked at have equally as thick files, we would have been accused of creating documentation after the fact. We would have been accused of creating a liberty interest. We would have been accused, as we have been accused, of defamation, and the other claims, false light, invasion of privacy, which we know is not a claim that Mr. Harris can bring because he's a public official. But that whole argument makes no sense. And when we use common sense and look at the facts of this case and we look how those other commissioners were treated, Mr. Harris wants you to find that white commissioners were treated more favorably. Not only were they treated more harshly in terms of the scrutiny at the time of their conduct and the documentation created, which Mr. Harris admits would be a negative act, they were all given the same option to resign or be terminated. And that's what occurred. So I'd suggest to you there's absolutely no evidence from which any legitimate inference can arise in this case that would support a finding that our legitimate nondiscriminatory reasons for what we did were a pretext for discrimination. I'm not going to go through the interference with contract claim, which I think has been pretty clearly analyzed by the district court, unless you have any questions about that, or in my remaining time if you have questions about any other issues. Now, I asked the appellant's counsel about whether certain claims had been abandoned, and she said absolutely not. And what's your argument? It was negligent infliction of emotional distress claim, equal protection claim, and racial discrimination claim to the extent it is based on disparate impact theory. The latter two claims, I believe, were abandoned by not being opposed at the summary judgment stage, is what the district court found, and we would agree with that. The district court was very careful then to proceed to analyze the claims anyway. And I'm sorry, what was the first was the race-based? Well, there was negligent infliction of emotional distress. Are you considering the equal protection claim and then racial discrimination claim on disparate impact? Yes, the negligent infliction. I think the issue with all of those is that they were not responded to at the summary judgment stage. And I think if I'm not, I may be mistaken, I apologize if I am, but I think they were not addressed. And then I think in the opening brief here, some of those claims were not addressed. But what the district court did is go ahead and analyze them, and then what we did was address them where it seemed appropriate. The negligent infliction of emotional distress claim, I think, wasn't discussed much at all in the briefs. And so we would agree that those that were not addressed at the summary judgment stage, yes, were waived, and those that were not addressed in the opening brief were waived, because they can't come back and argue them for the first time in the reply. If I can move to the retaliation claim briefly, the retaliation claim at the motion for summary judgment stage involved only the claim that the retaliatory act was the request that he resign. In the briefing, they raised several new arguments about issues that they now claim are not raised at the district court level, and therefore those arguments should not be made here or considered. With regard to the one retaliatory act at issue, and that's the claim that the firing was in retaliation for Ms. McCracken's letter, the district court correctly pointed out that the only argument they have there is proximity, the 10-day issue. But as Mr. Harris has already acknowledged that he was already on leave, already being investigated, and therefore understood in essence that he would be terminated because his belief was no commissioner ever came back to the court after being placed on leave, then therefore the retaliation, the alleged retaliatory act didn't actually follow any protected activity, but the protected activity was a reaction to what he understood was going to occur, and therefore there wasn't any retaliation in this case. And unless the court has questions about any other issues, I would just like to emphasize that I think the undisputed material facts show that this case and these facts were carefully considered by the superior court, and in fact maybe in an ill-conceived effort to make it easier on Mr. Harris, he was given the opportunity to resign or be fired. There wasn't any effort made to unduly document the allegations against him or to publicize them in any way, and certainly the court was hopeful that he would proceed as he has, and in fact he became a state employee and he became employed by the Attorney General's Office. There wasn't any desire to have him fail. In fact, Judge Campbell supported him in his application for the commissioner position. But we had the Attorney General's Office, Pam Cole, advising us from the outset of this investigation. She was present when the facts were discussed. She advised us that the termination was lawful. She advised us that it constituted judicial misconduct. There was a consensus between O'Toole, Rankinsmeyer, Campbell, Westover, that there were three canons of judicial ethics that were violated. And we are entitled, even though others may disagree under different circumstances, we are entitled to say that judicial officers in our court shall comport themselves in certain ways, and we have decided that that will not include asking different sex subordinates about tattoos and body piercings in intimate areas or to see tattoos or photos of tattoos or to send staff on errands that may involve liability or to type personal correspondence, homeowner's correspondence or a magistrate judge's application. Those are things we decided. There's nothing on the record, in the record or in the facts that would suggest that those reasons are pretextual, regardless of whether anyone else would agree with them. And therefore, I'd ask that you affirm the district court's order, which was very thorough and well-reasoned. And I thank you for your time and attention. Thank you. Ms. Baker did a tremendous job of turning spoliation and the failure to preserve evidence into a plus for my client. I ask on February 1st in this matter that all evidence be preserved. And when you're talking about retaliation, you should look at the evidence that's been preserved. We have not said that we want you to count the pages. We want you to actually read those files and compare them. In our statement of facts, approximately 99 through about 110 or so, we go through what is in white commissioners' files and what is in black commissioners' files. And if you go to ER, excuse me, I thought I had it here. Exhibit 60, which is ER 307 to 314, there is no personnel file. They never provided a personnel file. The only things we've been provided are these kind of conglomerations of documents. We were provided something called Exhibit 60 twice. We were provided 10,000 pages of something. And the judge requested that Ms. Baker tell us by bait stamp numbers what the investigative file was, and she couldn't. And in the file, the only file that we've been able to, Campbell says he doesn't have a file, which would have been the personnel file, are notes about Michelle Miller, are the summary of staff interviews, which never, but go through the things. The other thing is, is that our, yes. Excuse me. That is in the personnel file? There's only one file, as far as we can figure out, Your Honor. And that is what has been provided as Exhibit 60. And we have different versions of that. But Exhibit 60 has everything from my clients, what would be Form 50s in the federal government, to my letter to them, to odd notes, to things that happened. I'll tell you what my concern is. The principal thing to me is the liberty interest, and one, whether there was any kind of publication of, or public information revealed about sexual harassment, or the sort of thing that could be sexual harassment, that was made available to the public. Judge Callahan pointed out, when my client went to look for jobs, and the first time he applied at the AG's office, he didn't get the job and was called back, because they said that he had not been truthful with them, and they wanted to know about the sexual harassment at Superior Court. He had to say that over and over again. And worse is the omission, Your Honor. They're standing here now and saying, well, you didn't fire him for sexual harassment, but they never told Harris that. They never told me that. They didn't tell any of the alleged complainants, or the deputy administrator, and they certainly didn't tell the EEOC that. Also, in the retaliation, we go into the city of Glendale, and there is documentation. There are e-mails back and forth to Betsy Jobes about him appearing. There's Michelle Miller's testimony that she was the only reason the court found out was that she called somebody and Jobes called her, and Jobes follows up on this thing. Miller says there was no problem with Harris hearing the plea agreement. This is one where the facts have to be looked at, where I disagree vehemently with many of the facts that they say are undisputed, and the district court really ‑‑ I'm sorry. I appreciate it. Thank you very much. This matter will now stand submitted. The last two matters on calendar, Senate Pacific Farming Cooperative 0616326 has been submitted on the briefs and will stand submitted as of this date. A state of Randy Lopes v. Michael Astru, 0616370, that matter was submitted on the briefs, and it will be submitted as of this date. The court stands in adjournment. All rise. Have a good day. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you.
judges: Hug, Schroeder, Callahan